UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| NOE SOLIS GARCIA; ERNESTO SANTANA,<br><br>　　　　　Plaintiffs,<br>　　v.<br>MARIO BANA d/b/a Ideal RV & Trailer Supply; NANCY BANA d/b/a Ideal RV & Trailer Supply,<br>　　　　　Defendants.<br>_____/ | No. C 11-02047 LB<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## INTRODUCTION

Plaintiffs Noe Solis Garcia and Ernesto Santana (collectively, "Plaintiffs") brought this wage and hour action against defendants Mario Bana and Nancy Bana (collectively, "Defendants"), the owners and operators of Ideal RV & Trailer Supply ("Ideal RV"). Complaint, ECF No. 1.[1] They brought the following claims: failure to pay overtime wages in violation of California Labor Code § 510 and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 (first and third causes of action, respectively); failure to pay minimum wages for all hours worked in violation of California Labor Code § 1194 (second cause of action); failure to provide proper pay statements and maintain adequate records in violation of California Labor Code §§ 226 and 1174 (fourth cause of action);

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page number at the top of the document.

failure to pay wages due and waiting time penalties in violation of California Labor Code § 203 (fifth cause of action); and unfair competition in violation of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 (sixth cause of action). *See id*. The gist of Plaintiffs' complaint is that Defendants employed them as maintenance workers but that Defendants failed to properly or fully pay them for their work. *See id*.

All parties consented to the court's jurisdiction. Plaintiffs' Consent, ECF No. 9; Defendants' Consent, ECF No. 7. On October 4 and 5, 2012, Plaintiffs notified the court that they were abandoning their second cause of action for failure to pay minimum wages for all hours worked in violation of California Labor Code § 1194. Joint Proposed Final Pretrial Statement, ECF No. 63 at 3 n.1; Plaintiffs' Trial Brief, ECF No. 65 at 2 n.1. On November 5, 2012, counsel for Mr. Santana and counsel for Defendants orally stipulated to dismiss with prejudice all of Mr. Santana's claims, leaving only Mr. Garcia as a plaintiff. 11/5/2012 Minute Order, ECF No. 84. That same day, the court conducted a one-day bench trial on Mr. Garcia's remaining causes of action against Defendants (his first, third, fourth, fifth, and sixth causes of action). *Id*.

During the trial, the court heard testimony from the following eight witnesses: (1) Raymond Arceo; (2) Noe Garcia; (3) Philip Poor; (4) Renato Zapata; (5) Mario Bana; (6) Richard Gonzales; (7) Nancy Bana; and (8) Maryann Bana. The court also received into evidence (1) payroll records and paystubs for Mr. Garcia that were produced by Defendants during discovery and which are bates-stamped BANA000001 through BANA000152 (Joint Exhibit 1); (2) screenshots of the website for Ideal RV (Joint Exhibit 2); photographs of the certain areas near Ideal RV (Joint Exhibit 3); (4) Plaintiffs' "audit" of the payroll records of Mr. Garcia that were produced by Defendants during discovery (Joint Exhibit 4); and (5) paystubs for Mr. Garcia that he received from Ideal RV at the time he was originally paid and which are bates-stamped GARCIA-0000001 through GARCIA-0000024 (Plaintiff's Exhibit 5). Furthermore, with the court's permission, on November 6, 2012, Defendants filed their designations of Mr. Garcia's deposition transcript, in lieu of reading them into the record during the November 5, 2012 trial. Defendants' Designations, ECF No. 86.

Against this backdrop, and after considering the testimony and evidence in the record, as explained below, the court rules that Mr. Garcia is not entitled to relief on any of his causes of

action.

## FINDINGS OF FACT[2]

### I. MR. GARCIA'S POSITION AND WAGES AT IDEAL RV

Since about 2002, Ideal RV has been owned and operated by Mario Bana. Mr. Bana works at Ideal RV each day that it is open and sets the work schedules for Ideal RV's employees, of which there usually are 3 to 5. Nancy Bana does not work for Ideal RV and has no role in its business.

Mr. Garcia worked for Ideal RV from June 2006 to October 10, 2009.[3] During that time, he worked on recreational vehicles ("RVs") and trailers, fixed air conditioners, refrigerators, water heaters, electrical systems, braking systems, changed tires, and caulked. He received the following hourly wages during the course of his employment: $12 per hour (June 3, 2006 – July 14, 2006); $13 per hour (July 15, 2006 – March 10, 2007); $14 per hour (March 11, 2007 – October 19, 2007); $14.50 per hour (October 20, 2007 – July 11, 2008); $15.50 per hour (July 12, 2008 – March 6, 2009); $13.50 per hour (March 7, 2009 – July 10, 2009); $14 per hour (July 11, 2009 – October 10, 2009).

According to Mr. Garcia, he was fired by Mr. Bana after he suffered an on-the-job injury. He testified that in October 2009 he was a passenger in a vehicle being driven by Mr. Bana when their van was rear-ended. He testified that he was hurt in the collision, but when a police officer asked him if he was hurt, Mr. Bana told the officer that Mr. Garcia was fine. The officer then asked Mr. Garcia again if he was hurt and Mr. Garcia told the officer that he indeed was hurt. According to Mr. Garcia, Mr. Bana then told the officer that he would take Mr. Garcia to the hospital, but Mr. Bana never did. Instead, they just drove back to Ideal RV. Mr. Garcia later went to the hospital on his own and was told that he needed treatment and surgery. When Mr. Garcia told Mr. Bana this,

---

[2] The court notes that the parties did not stipulate to any facts.

[3] The court notes that Mr. Garcia testified on direct examination that he started working for Ideal RV "sometime in 2005," but he also did not challenge on cross examination Defendants' counsel's suggestion that he started in June 2006. Moreover, Mr. Bana testified on direct examination that he believed Mr. Garcia started working for Ideal Rv in June 2006, and the payroll records and paystubs provided by Defendants (Joint Exhibit 1) also support a start date in June 2006. For these reasons, the court finds that Mr. Garcia started working for Ideal RV in June 2006.

Mr. Bana fired Mr. Garcia.

Mr. Bana acknowledged that he and Mr. Garcia indeed were in a traffic accident, but he disputes Mr. Garcia account of the events.

## II. MR. GARCIA'S WORK SCHEDULE

Ideal RV's normal business hours during the time when Mr. Garcia worked there were as follows: from Monday through Friday, Ideal RV was open from 9:00 AM to 6:00 PM, and on Saturdays, Ideal RV was open from 9:00 AM to 5:00 PM. Ideal RV was closed on Sunday.

### A. Mr. Garcia's Work Hours

Mr. Garcia testified that Mr. Bana told him and the other employees that although the store hours were from 9:00 AM to 6:00 PM (Mondays through Fridays) or from 9:00 AM to 5:00 PM (Saturdays), they needed to arrive 10 to 15 minutes before 9:00 AM because they needed to take items out and set up for the day and that they needed to stay later than the closing time to clean up or finish important jobs. Mr. Garcia testified that he was not allowed to punch his timecard until 9:00 AM, though, and he was sometimes required to punch his timecard at 6:00 PM and then finish working. On cross-examination, however, Mr. Garcia acknowledged that he never mentioned anything about working off-the-clock during his deposition and admitted that he sometimes arrived late for work. Indeed, during his deposition, when asked what his work hours were, he stated only that the work hours were from 9 AM to 6 PM on Monday through Friday and from 9 AM to 5 PM on Saturday. Mr. Garcia also testified that he could not estimate the number of days on which he worked more than 8 hours, and this was consistent with his deposition testimony.

Contrary to Mr. Garcia's testimony, Mr. Bana testified that Mr. Garcia was late "almost every day," so Mr. Garcia always punched his timecard as soon as he arrived. Mr. Garcia admitted at trial that Mr. Bana used to criticize him for being late for work on occasion. The only other witness to testify about Mr. Garcia's hourly schedule was Philip Poor, who acted as a night watchman for Ideal RV for part of 2009 and whose employment overlapped with Mr. Garcia's employment by 3 or 4 months. Mr. Poor confirmed that he testified that in his deposition that the latest he would see Mr. Garcia was about 6:00 PM and that usually Mr. Garcia would leave at 6:00 PM "on the dot." And Maryann Bana, who is Mr. Bana's daughter and who has handled Ideal RV's timecard process since

she started working there in the middle of 2009, testified that she did not recall Mr. Garcia ever working more than 8 hours in a day or 40 hours in a week.

In sum, Mr. Garcia testified for the first time at trial that he was required to work 10 to 15 minutes off-the-clock each morning and was sometimes required to work off-the-clock in the evenings as well, but this testimony contradicted his earlier deposition testimony in which he testified that his work hours were those during which Ideal RV was open. In light of this contradiction, the court finds Mr. Garcia's trial testimony on this point to be not entirely credible. In addition, Mr. Bana testified that Mr. Garcia frequently arrived at work late, Mr. Poor testified that the latest he ever saw Mr. Garcia was 6:00 PM, and Maryann Bana testified that she did not recall Mr. Garcia ever working more than more than 8 hours in a day or 40 hours in a week. While Mr. Bana did not specify whether arriving late to work meant arriving after 9:00 AM, and while Mr. Poor's and Maryann Bana's employment overlapped with Mr. Garcia's only for a short period of time, the court finds their testimony to be credible on this point. Thus, the court finds that Mr. Garcia did not work off-the-clock and that his timecards provided an accurate accounting of his daily work hours.

**B. Mr. Garcia's Work Days**

Mr. Garcia testified that Mr. Bana told him when he was hired that he would have to work Monday through Saturday and that if he did not want to work Saturdays then he could not work at Ideal RV. He testified that employees were required to work from 9 AM to 6 PM on Mondays through Friday and from 9 AM to 5 PM on Saturdays, which are the hours Ideal RV is open. He contends that he worked each day during the week (Monday through Friday) and also worked on Saturdays, and that this means he should have received overtime for his Saturday work.

Other testimony provided, though, suggests that while Mr. Garcia often worked on Saturdays, he also often took days off of work during the week. Mr. Garcia testified that could not remember if he had or had not taken any days off of work during his time at Ideal RV, although he did testify that he would take a day off "every now and then" if he was sick or "needed to take care of something." He also testified that he occasionally took a Saturday off when he had something important to do or was sick, but in his interrogatory responses he stated that he did not recall ever taking a Saturday off.

Mr. Bana, for this part, testified that he did not recall any of his employees working 6 days in a week from 2006 to 2010.  He testified that he tries to have Ideal RV employees work no more than 40 hours per week, which means that if an employee is working on Saturday that employee had to have taken other days off during the week.  With respect to Mr. Garcia, Mr. Bana testified that Mr. Garcia "worked a lot of Saturdays" but took other days off during the week.  For example, Mr. Bana testified that, to get his 40 hours, Mr. Garcia might work Saturday but take Tuesday or Wednesday off.  He believed that Mr. Garcia usually took a Tuesday off.  He testified that Mr. Garcia did this because he sometimes had to take his child to the doctor during the week.  And although Mr. Bana did not track vacation days, he recalled that Mr. Garcia took some time off during the holidays (each Ideal RV employee accrued one week of vacation each year).

Maryann Bana's testimony corroborates this practice.  She testified that she has worked at Ideal RV for 5 days a week for approximately the past 3 years and that she usually takes off a day during the week (usually Mondays) and works on Saturday instead.  Maryann Bana testified that Mr. Garcia, too, often took a day off during the week and then worked Saturday (at least during the times that their employment overlapped in 2009).  She also did not recall Mr. Garcia ever working more than 40 hours in a week.  This also comports with the testimony of Nancy Bana, who often came to Ideal RV after she got off of work on weekdays around 4:30 PM, sometimes saw Mr. Garcia there, but sometimes she did not.

Finally, Mr. Gonzales, who also acted as a night watchman for Ideal RV from 2005 or 2006 until 2012 during the hours of 6 PM and 8:00 or 9:00 AM, testified that Mr. Garcia sometimes took time off, such when he had go to projects at his kids' school or when his kids were sick.  He testified that he "occasionally" saw Mr. Garcia working on Saturdays.

The testimony of Mr. Arceo and Mr. Zapata also does not conflict with the testimony of Mr. Bana, Maryann Bana, Nancy Bana, or Mr. Gonzales, and it also does not establish that Mr. Garcia worked more than 40 hours per week and/or worked every Saturday.  Mr. Arceo, who has lived next to Ideal RV since 2004 was home nearly every day during the relevant period, testified that he could see over the 6-foot fence between his home and Ideal RV's property and saw Mr. Garcia working on top of RVs "almost every day."  He testified that he saw Mr. Garcia working on Saturdays while Mr.

Arceo and his friends barbequed before and while watching football, but he also testified that he saw Mr. Garcia working on Sundays, too (and Ideal RV is not open on Sundays). Mr. Arceo also admitted on cross-examination that he often left the house on Saturday afternoons. And Mr. Zapata, who lived with Mr. Arceo from around 2006 to 2010 and who did not work on Saturdays, testified that he saw Mr. Garcia working on top of Rvs after he returned from work on weekdays and on Saturdays "now and then." He also testified that the latest he saw Mr. Garcia on Saturdays was around 3:30 PM.

In sum, Mr. Garcia contends that he worked every weekday and every Saturday, but his testimony, and the testimony of others, suggests otherwise. He testified that he worked most Saturdays and occasionally took either weekdays or Saturdays off, and the testimony of Mr. Bana, Maryann Bana, Mr. Gonzales, Mr. Arceo, Mr. Zapata, and Nancy Bana also indicates that Mr. Garcia did not work every weekday and every Saturday; rather, he often took one day off during the week and worked Saturday instead. Thus, the court finds that Mr. Garcia occasionally or often worked on Saturdays, but when he did he had taken off a day during the week.

**C. Mr. Garcia's Lunch Breaks**

Mr. Garcia testified that he was provided an hour lunch on Mondays through Fridays, but that he worked through lunch on Saturdays because Mr. Bana provided lunch for the employees on those days. Mr. Bana confirmed that he did, in fact, provide lunch for his employees on Saturdays.

Mr. Poor testified, though, that, at least for the periods during which their employment overlapped, Mr. Garcia always took his lunch break (regardless of the day). But Mr. Poor did note that the employees' lunches "most of the time" were interrupted because a customer needed something. Mr. Bana also testified that required his employees to continue to assist customers during the lunch break (he gave them a half-hour to eat) and that he paid them for this time.

Based on the limited testimony on this issue, and because the court finds all of the witnesses to be credible on it, the court finds that Mr. Garcia always received and took a lunch break (whether during the week or on Saturdays), but that his half-hour lunch breaks on Saturday, which Mr. Garcia was paid for, were interrupted by work tasks.

///

### III. IDEAL RV'S RECORDKEEPING AND PAYMENT OF WAGES

Mr. Garcia testified that Ideal RV required its employees to use two timecards: one for use from Monday through Friday and that was for recording time from 9:00 AM to 6:00 PM, and one for use on Saturdays and that was for recording time from 9:00 AM to 5:00 PM. He testified that on Saturdays, sometimes he punched the Saturday timecard himself and sometimes Mr. Bana would simply fill it in for him. Regardless, Mr. Garcia testified that he was accurate with all of his timecard punches. Mr. Garcia also testified that the Saturday timecard was used until five Saturdays had been worked, and then Mr. Bana would pay him in cash for those five Saturdays and would tear up and throw away the Saturday timecard. Mr. Poor also testified to this effect. Mr. Garcia testified that Mr. Bana paid him his normal hourly rate for work on Saturdays.

More generally, with respect to both sets of timecards, Mr. Bana testified that since 2006 he normally took the timecards, added up the hours, and then called Ideal RV's bookkeeper and told the bookkeeper the hours that each employee worked during a given pay period. Later, the bookkeeper would fax Mr. Bana employees' the hours and the amounts to pay them, along with a paystub. Thereafter, Mr. Bana would write a check for each employee in the amount stated by the bookkeeper, and he would either give the employee the check and paystub or leave it for them to pick up. If an employee ever worked more than 40 hours in a week, Mr. Bana assumed that the bookkeeper would pay the employee overtime (time and a half) for the hours over 40. Mr. Bana did not keep any copies of the paystubs because his bookkeeper did so. Mr. Bana did not look at the paystubs much. He only looked at the totals and wrote a check.

Since the middle of 2009, Maryann Bana has handled the above-described timecard and payment process for Ideal RV. She testified that the bookkeeper required her to submit Ideal RV employees' hours with 15 minute increments, so, for example, if an employee worked 10 minutes into an increment, she would round up to 15 minutes.

Mr. Bana and Maryann Bana both testified that Mr. Garcia never complained to them about his paystubs or his paychecks.

During discovery, Defendants produced copies of what it claims are its payroll records and paystubs for Mr. Garcia (Joint Exhibit 1). At the trial, however, Mr. Garcia presented what he

claims are copies of certain paystubs that he received from Mr. Bana (Plaintiff's Exhibit 5).  He testified that the paystubs provided by Defendants (Joint Exhibit 1) do not look like the ones he actually received.  And indeed, there are differences.  For instance, on the paystubs provided by Defendants the name "MARIO" appears in capital letters in the upper left corner and in the bottom left corner of the document, but on the paystubs provided by Mr. Garcia the name "Ideal RV & Trailer Supply" appears in that same spots.  Also, while the paystubs provided by Defendants contain most of the same information that the paystubs provided by Mr. Garcia contain (entry fields for "employee pay stub," "check number," "pay period," "pay date," "employee," "social security number," "earnings and hours," "taxes," and "net pay"), the paystubs provided by Defendants do not contain fields for the employee's "status" (e.g., single, married, etc.) or "allowances/extra" as the paystubs provided by Mr. Garcia do.  Also, some of the paystubs contain a check number, while others do not.

Additionally, Mr. Garcia pointed out some errors.  For instance, the paystub that Defendants stated for the pay period of August 12, 2006 to August 18, 2006 that his year-to-date federal withholding was $35 and that his year-to-date net pay was $4,956.50 (*see* BANA000054), but the paystub he received stated for the same pay period that his year-to-date federal withholding was $140 and his year-to-date net pay was $4,851.50 (*see* GARCIA-0000009).  Also, 2 paystubs indicate that Mr. Garcia was paid for work before it was performed. See BANA000020 (indicating that a check was issued on May 5, 2009 for the pay period of May 23, 2009 to May 29, 2009); BANA000071 (indicating that a check was issued on December 22, 2006 for the pay period of December 23, 2006 to December 29, 2006).

Furthermore, there are missing periods of time for which Defendants did not produce paystubs. Specifically, there are no paystubs with pay periods covering the following dates:

2006

October 28, 2006 to November 3, 2006
December 18, 2006 to December 22, 2006

2007

December 31, 2006 to January 6, 2007
January 14, 2007 to January 20, 2007

<pre>
January 28, 2007 to February 3, 2007
February 13, 2007 to February 19, 2007
March 25, 2007 to March 31, 2007
April 1, 2007 to April 7, 2007
April 8, 2007 to April 13, 2007
May 19, 2007 to May 25, 2007
May 26, 2007 to June 1, 2007
June 9, 2007 to June 15, 2007
June 16, 2007 to June 22, 2007
June 30, 2007 to July 6, 2007
August 4, 2007 to August 10, 2007
August 25, 2007 to August 31, 2007
September 1, 2007 to September 7, 2007
September 8, 2007 to September 10, 2007
October 2, 2007 to October 5, 2007
October 13, 2007 to October 19, 2007
November 10, 2007 to November 16, 2007
</pre>

<u>2008</u>

<pre>
December 29, 2007 to January 4, 2008
January 5, 2008 to January 11, 2008
February 12, 2008 to February 15, 2008
March 8, 2007 to March 14, 2008
March 15, 2008 to March 21, 2008
March 22, 2008 to March 28, 2008
June 7, 2008 to June 14, 2008
July 26, 2008 to August 1, 2008
August 16, 2008 to August 22, 2008
November 8, 2008 to November 14, 2008
</pre>

<u>2009</u>

<pre>
February 28, 2009 to March 6, 2009
April 25, 2008 to May 1, 2009
June 13, 2009 to June 19, 2009
</pre>

*See* Joint Exhibit 1.

On the other hand, there a few instances where it appears Mr. Garcia was paid more than once for the same pay period. Specifically: (1) 3 paystubs were produced that cover the pay period of March 1, 2008 to March 7, 2008 (although the paystubs indicate that checks was issued on March 17, 2008, March 24, 2008, and March 31, 2008 for that pay period); (2) 2 paystubs were produced that cover the pay period of March 31, 2008 to June 6, 2008 (although the paystubs indicate that checks were issued on June 9, 2008 and June 17, 2008 for that period); (3) 2 paystubs were produced that cover the pay period of July 19, 2008 to July 25, 2008 (although the paystubs indicate that checks were issued on July 28, 2008 and August 5, 2008 for that period); (4) 3 paystubs were

1  produced that cover the pay period of December 20, 2008 to December 26, 2008 (although the
2  paystubs indicate that checks were issued on December 29, 2008, January 5, 2009, and January 12,
3  2009 for that period); and (5) 2 paystubs were produced that cover the pay period of May 23, 2009
4  to May 29, 2009 (although the paystubs indicate that checks were issued on May 5, 2009 and June 1,
5  2009 for that period).

### IV. MR. GARCIA'S ASSERTION THAT DEFENDANTS FALSIFIED EVIDENCE

At trial, Mr. Garcia raised for the first time an assertion that the above-described anomalies in the paystubs provided by Defendants must mean that Defendants have submitted false evidence. Defendants, after reviewing these anomalies, simply contend that any anomalies are bookkeeping errors. Defendants also contend that any errors are irrelevant because Mr. Garcia's claims are based on the failure to pay overtime wages for Saturday work and the paystubs did not account for Saturday hours.

Based on the evidence presented, the court credits Defendants' explanation that any anomalies were bookkeeping errors. *See* Defendants' Brief re: Anomalies, ECF No. 89; Mendoza Declaration, ECF No. 89-1 ¶ 4. Mr. Garcia presented no credible evidence in support of his claim that the Defendants knowingly falsified these documents. *See generally* Plaintiff's Brief re: Anomalies, ECF No. 88.

### CONCLUSIONS OF LAW

### I. MR. GARCIA'S CLAIMS AGAINST NANCY BANA

Mr. Garcia named Nancy Bana, Mr. Bana's wife, as a defendant to this action. Nothing in the record establishes that she is an owner or operator of Ideal RV or otherwise had anything to do with Ideal RV's operations. The only testimony in the record shows only that she picked her husband, Mr. Bana, up from Ideal RV in the late afternoons during the week. Because Mr. Garcia has failed to provide any evidence whatsoever to establish Nancy's Bana's liability for any of his claims, the court concludes that all of his claims against her fail and that judgment should be entered in her favor.

///
///

UNITED STATES DISTRICT COURT
For the Northern District of California

## II. MR. GARCIA'S CLAIMS AGAINST MARIO BANA

**A. Mr. Garcia's First and Third Causes of Action: Failure to Pay Overtime under California Labor Code § 510 and the Fair Labor Standards Act**

Mr. Garcia brings two causes of action against Mr. Bana—one under California Labor Code § 510 (first cause of action) and one under the Fair Labor Standards Act (second cause of action)—for Mr. Bana's alleged failure to pay him overtime.

*1. Mr. Bana Is an "Employer" under both the California Labor Code and the FLSA*

Before discussing in detail whether Mr. Bana is liable under California Labor Code § 510 and/or the FLSA, the court must first determine whether Mr. Bana even can be liable under them.

California Labor Code § 1194 provides a right to sue for unpaid minimum wages or overtime compensation. According to the California Supreme Court, the legislature is presumed to have intended the Industrial Welfare Commission's ("IWC") wage orders to state who is liable for such claims, and, "[a]s defined in the [IWC's] wage orders, '"[e]mployer" means any person . . . who . . . employs or exercises control over the wages, hours, or working conditions of any person,' and '"[e]mploy" means to engage, suffer, or permit to work.'" *Martinez v. Combs*, 49 Cal. 4th 35, 52, 64 (2010); *see also* Industrial Welfare Commission Order No. 4-2001 Regulating Wages, Hours, and Working Conditions in the Professional, Technical, Clerical, Mechanical and Similar Occupations, 8 Cal. Code. Regs. § 11040.

The FLSA, which provides that an employee who works more than forty hours a week must be paid at least one and one-half times his or her regular rate for those additional hours, 29 U.S.C. § 207(a)(1), defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). This definition is not limited by the common law concept of an "employer," but instead "'is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'" *Boucher v. Shaw*, 572 F.3d 1087, 1090-91 (9th Cir. 2009) (quoting *Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999) (en banc)). Whether an employer-employee relationship exists depends upon "the circumstances of the whole activity," particularly the "economic reality" of the relationship. *Id.* The economic reality test requires the court to examine whether the alleged employer: (1) had the power to hire and fire

1   the employee; (2) supervised and controlled employee work scheduled or conditions of employment;
2   (3) determined the rate and method of payment; and (4) maintained employment records. *Bonnette*
3   *v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (abrogated on other
4   grounds by *Garcia v. San Antonio Metro. Transit Authority*, 469 U.S. 528, 539 (1985)).

5   Here, Mr. Bana had the power to hire and fire Mr. Garcia, supervised and exercised control over
6   Mr. Garcia's wages, hours, and working conditions, determined the method of payment of Mr.
7   Garcia's wages, and maintained Ideal RV's employment records. The court thus finds that Mr. Bana
8   is an "employer" under both the California Labor Code and the FLSA.

   *2. Burden Shifting Standard for Both Claims*

10  Having determined that Mr. Bana could be liable under Mr. Garcia's first and third causes of
11  action, the court now turns to Mr. Garcia's burden of proving that he is.

12  An employee bringing an overtime claim under the Fair Labor Standards Act has the burden of
13  proving that he performed work for which he was not properly compensated. *Anderson v. Mt.*
14  *Clemens Pottery*, 328 U.S. 680, 687-88 (1946). In view of the remedial purpose of the FLSA and
15  the employer's statutory obligation to keep proper records of wages, hours and other conditions and
16  practices of employment, this burden is not to be "an impossible hurdle for the employee." *Id*.
17  "[W]here the employer's records are inaccurate or inadequate and the employee cannot offer
18  convincing substitutes, . . . the solution . . . is not to penalize the employee by denying him any
19  recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a
20  result would place a premium on an employer's failure to keep proper records . . . ; it would allow
21  the employer to keep the benefits of an employee's labors without paying due compensation as
22  contemplated by the [FLSA]." *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986) (quoting
23  *Anderson*, 328 U.S. at 688).

24  "[A]n employee has carried out his burden if he proves that he has in fact performed work for
25  which he was improperly compensated and if he produces sufficient evidence to show the amount
26  and extent of that work *as a matter of a just and reasonable inference*." *Id*. (emphasis in original).
27  The burden then shifts to the employer to show the precise number of hours worked or to present
28  evidence sufficient to negate "the reasonableness of the inference to be drawn from the employee's

evidence." *Id.* If the employer fails to make such a showing, the court "may then award damages to the employee, *even though the result be only approximate*." *Id.* (emphasis in original). "[A]n award of back wages will not be barred for imprecision where it arises from the employer's failure to keep records as required by the FLSA." *Id.*; *see also Hernandez v. Mendoza*, 199 Cal. App. 3d 721, 727 (1988) (quoting and applying standard set forth in *Brock* in connection with California Labor Code claim).

### *3. Mr. Garcia Did Not Prove a Violation of California Labor Code § 510*

California Labor Code § 510 provides that: "Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee." And the FLSA provides that an employee who works more than forty hours a week must be paid at least one and one-half times his or her regular rate for those additional hours. 29 U.S.C. § 207(a)(1),

Mr. Garcia's overtime claims are based upon his assertions that he had to work off-the-clock each morning and evening, and that he worked every Saturday and that those Saturday hours all were in excess of the 40 hours he already had worked during the week. But as the court found above, Mr. Garcia did not work off-the-clock and that his timecards provided an accurate accounting of his daily work hours. The court also found above that Mr. Garcia occasionally or often worked on Saturdays, but when he did he had taken off a day during the week. There were contradictions and equivocation in Mr. Garcia's own testimony of these points, and so the court did not provide it much weight, and the testimony of other witnesses undermined his assertions that he worked off-the-clock, that he worked every weekday, and that his Saturday hours should have been paid as overtime. Thus, the court finds that Mr. Garcia has not carried his burden to prove "that he has in fact performed work for which he was improperly compensated" and has not provided "sufficient evidence to show the amount and extent of that work *as a matter of a just and reasonable inference*." *Brock*, 790 F.2d at 1448 (9th Cir. 1986) (quoting *Anderson*, 328 U.S. at 688); *Hernandez*, 199 Cal. App. 3d at 727 (quoting and applying standard set forth in *Brock* in connection

1   with California Labor Code claim).  Accordingly, Mr. Garcia is not entitled to damages for failure to
2   pay overtime in violation of California Labor Code § 510 or the FLSA.

3   **B.   Sixth Cause of Action: Unfair Competition in Violation of California's Unfair**
4   **Competition Law, Business and Professions Code § 17200**

5       Mr. Garcia's sixth cause of action for violation of California's Unfair Competition Law is based
6   on Mr. Bana's failure to pay him overtime and to provide him with meal periods.  *See* Plaintiff's
7   Trial Brief, ECF No. 65 at 6; Amended Joint Proposed Final Pretrial Order, ECF No. 82 at 8;
8   Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF No. 79 at 6.  As stated above,
9   the court concluded that Mr. Garcia did not meet his burden to prove that he is owed overtime, and
10  so the court concludes that Mr. Garcia is not entitled to restitution on this basis.  The court addresses
11  below whether Mr. Garcia is entitled to restitution under the UCL based on his for missed meal
12  periods.

13      California Business and Professions Code § 17200 prohibits three types of wrongful business
14  practices: any (1) unlawful, (2) unfair, or (3) fraudulent business practice or act.  *See People ex rel.*
15  *Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002).  "With respect to the
16  unlawful prong, [v]irtually any state, federal or local law can serve as the predicate for an action
17  under section 17200."  *Id*. (internal citation and quotation marks omitted).  "'[I]n essence, an action
18  based on Business and Professions Code section 17200 to redress an unlawful business practice
19  'borrows' violations of other laws and treats these violations, when committed pursuant to a
20  business activity, as unlawful practices independently actionable under section 17200 et seq. and
21  subject to the distinct remedies provided thereunder.'"  *Id*.

22       Yet "[w]hile the scope of conduct covered by the UCL is broad, its remedies are limited."
23  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144 (2003) (citing *Cel-Tech*
24  *Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999)).
25  Because "[a] UCL action is equitable in nature[,] damages cannot be recovered," *id*. (citing *Bank of*
26  *the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992)), and the California Supreme Court has
27  stated that "'[p]revailing plaintiffs are generally limited to injunctive relief and restitution,'" *id*.
28  (quoting *Cel-Tech*, 20 Cal.4th at 179).

1    As for the alleged predicate unlawful business practice, California Labor Code § 512(a) requires
2 that "[a]n employer may not employ an employee for a work period of more than five hours per day
3 without providing the employee with a meal period of not less than 30 minutes." California Labor
4 Code § 226.7 provides that "[n]o employer shall require any employee to work during any meal or
5 rest period mandated by an applicable order of the Industrial Welfare Commission" and that "[i]f an
6 employer fails to provide an employee a meal period or rest period in accordance with an applicable
7 order of the Industrial Welfare Commission, the employer shall pay the employee one additional
8 hour of pay at the employee's regular rate of compensation for each work day that the meal or rest
9 period is not provided." Cal. Labor Code § 226.7(a), (b). In turn, IWC Wage Order 4-2001, 8 Cal.
10 Code Regs. § 11040, provides that, "[u]nless the employee is relieved of all duty during a 30 minute
11 meal period, the meal period shall be considered an 'on duty' meal period and counted as time
12 worked." *Id*. at 11(A).

13    Payment for missed meal periods constitutes a wage and is subject to a three-year statute of
14 limitations. *See* Cal. Code Civ. P. § 338; *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal. 4th
15 1094, 1110-1111 (2007). In addition, an employer is required to keep records showing the meal
16 period taken by employees. 8 Cal. Code Regs. § 11050.

17    Here, the court found above that Mr. Garcia always received and took his lunch break, whether
18 during the week or on Saturdays, but that his Saturday lunch breaks were interrupted by work tasks.
19 Mr. Garcia testified that he was provided an hour for lunch on Mondays through Fridays and that
20 Mr. Bana provided lunch for his employees of Saturdays (testimony that was confirmed by Mr.
21 Bana), but that he often worked through lunch on Saturdays. Mr. Poor testified, though, that, at least
22 for the periods during which their employment overlapped, Mr. Garcia always took his lunch break
23 (regardless of the day), but also testified that the employees' lunches "most of the time" were
24 interrupted because a customer needed something. Thus, many of Mr. Garcia's lunch breaks must
25 be considered to have been "on duty" meal periods and counted as time worked. 8 Cal. Code Regs.
26 § 11040(11)(A).

27    Mr. Garcia would only have suffered harm, however, if he was not paid for these "on duty"
28 lunch breaks on Saturdays, but the evidence demonstrates that he was paid for these breaks. As

1    stated above, Mr. Garcia testified only that he did not receive a lunch break at all on Saturdays,
2    which the court found not to be true.  Mr. Bana testified that he bought lunch for his employees on
3    Saturdays and gave them half an hour to eat (albeit while "on duty"), but he also testified that he
4    paid them for this half-hour.  He also testified that he worked from 9:00 AM to 5:00 PM on
5    Saturdays, and he does not claim that he was not paid for all of that time.  (His claim about the
6    Saturday hours is that he should have received overtime for them, not that he was not paid for all of
7    his Saturday hours.)

8    In sum, because Mr. Garcia worked for 8 hours on Saturdays (9:00 AM to 5:00 PM), Mr. Bana
9    was required to provide Mr. Garcia with a lunch break.  Mr. Bana did provide Mr. Garcia with a
10   half-hour lunch break.  And because Mr. Garcia was required to remain "on duty" during this lunch
11   break, Mr. Bana was required to count the lunch break as time worked and pay Mr. Garcia for that
12   time.  Mr. Bana did so.  Accordingly, the court finds that Mr. Garcia is not entitled to restitution
13   under the UCL.

14   **C. Mr. Garcia's Fourth Cause of Action: Failure to Provide Proper Pay Statements and**
15   **Maintain Adequate Records in Violation of California Labor Code § 226**

16   Mr. Garcia's fourth cause of action asserts that Mr. Garcia failed to provide him with proper pay
17   statements or maintain adequate records in violation of California Labor Code § 226.

18   California Labor Code § 226(a) requires an employer to furnish semimonthly or at the time each
19   payment of wages is made a wage statement showing, among other things, the gross wages earned,
20   the total hours worked, and all applicable hourly rates and deductions.  And California Labor Code §
21   226(e) provides that "[a]n employee suffering injury as a result of a knowing and intentional failure
22   by an employer to comply with [§ 226(a)] is entitled to recover the greater of all actual damages or
23   fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars
24   ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate
25   penalty of four thousand dollars ($4,000) . . . ."  "Statutory damages arising under Cal. Lab. Code §
26   226(e) are deemed a 'penalty,' while actual damages are considered 'wages,' for the purposes of
27   determining the applicable limitations period."  *Delgado v. Deanda*, No. 10–CV–02799–LHK, 2012
28   WL 1909606, at *2 (N.D. Cal. May 24, 2012) (citing *Singer v. Becton, Dickinson & Co.*,

08–CV–0821, 2008 WL 2899825, at *5 (S.D. Cal. July 25, 2008) (finding that statutory damages under § 226(e) are "penalties" subject to a one-year statute of limitation pursuant to Cal. Code Civ. Proc. § 340(a), whereas actual damages under § 226(e) are "wages" subject to a three-year statute of limitation pursuant to Cal. Code Civ. Proc. § 338(a))).

Here, Mr. Garcia seeks either actual or statutory damages, whichever is greater. *See* Complaint, ECF No. 1 ¶ 17. Here, although Mr. Bana did not provide Mr. Garcia with proper or accurate pay statements because any paystubs did not account for Mr. Garcia's Saturday hours (for which he was paid in cash), Mr. Garcia nevertheless is not entitled to either actual or statutory damages. Statutory damages are barred by the applicable one-year statute of limitations, as Mr. Garcia's employment at Ideal RV ended on October 10, 2009, but he did not file his complaint until April 26, 2011. And the court already has found that the two bases for his actual damages—unpaid overtime and meal periods, *see* Plaintiffs' Trial Brief, ECF No. 65 at 8; Amended Joint Proposed Final Pretrial Order, ECF No. 82 at 10; Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF No. 79 at 9—fail and that he is not entitled to damages or restitution for them. Mr. Garcia presented no other evidence at trial regarding the actual damages he might have suffered as a result of his receiving improper or inaccurate pay statements. Accordingly, Mr. Garcia is not entitled to damages under California Civil Code § 226.

**D. Fifth Cause of Action: Failure to Pay Wages Due and Waiting Time Penalties in Violation of California Labor Code § 203**

Mr. Garcia also brings a claim for unpaid wages and waiting time penalties under California Labor Code § 203. The basis for this claim is that he was not paid overtime wages that were due to him. *See* Plaintiffs' Trial Brief, ECF No. 65 at 10 ("Here, it is clear that Defendants' conniving time recording and record keeping system, combined with the hybrid check and cash payment system, was clearly a design to intentionally deny employees the required overtime wage."); Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF No. 79 at 10 (same).

California law requires the prompt payment of all wages due. "Wages" include pay for all hours worked, including overtime pay. *See* Cal. Labor Code § 200(a). If an employer fails to pay all wages due, California Labor Code § 203 requires payment of "waiting time penalties" to the affected

employees. "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefore is commenced; but the wages shall not continue for more than 30 days." Cal. Labor Code § 203.

The language of § 203, by use of the term "shall" regarding the payment of this penalty, is mandatory if the violation is willful. "A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." 8 Cal. Code. Reg. § 13520. "A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.'" 8 Cal. Code. Reg. § 13520(a).

Here, the court already concluded that Mr. Garcia did not meet his burden to prove "that he has in fact performed work for which he was improperly compensated" and has not provided "sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference," *Brock*, 790 F.2d at 1448 (9th Cir. 1986) (quoting *Anderson*, 328 U.S. at 688), and concluded that he is not entitled to damages for failure to pay overtime in violation of California Labor Code § 510 or the FLSA. Accordingly, the court also concluded that Mr. Garcia is not entitled to damages or waiting time penalties under California Labor Code § 203.

**IT IS SO ORDERED.**

Dated: February 18, 2013

_____
LAUREL BEELER
United States Magistrate Judge

C 11-02047 LB
FINDINGS OF FACT AND CONCLUSIONS OF LAW
19